# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: _August 4, 2016_____

**NO. 33,784**

**JOSEPH LEE CHRISTOPHERSON, as Personal Representative of the Estate of MERCEDES LOUISE CHRISTOPHERSON, and JOSEPH LEE CHRISTOPHERSON, individually,**

    Plaintiffs-Appellees,

**v.**

**ST. VINCENT HOSPITAL, a New Mexico Non-Profit Corporation d/b/a CHRISTUS ST. VINCENT REGIONAL MEDICAL CENTER,**

    Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Raymond Z. Ortiz, District Judge**

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

Katherine W. Hall PC
Katherine W. Hall
Santa Fe, NM

The Zamora Law Firm, LLC
D. Diego Zamora
Santa Fe, NM

for Appellees

Modrall, Sperling, Roehl, Harris & Sisk
Tim L. Fields
Emil J. Kiehne
Susan M. Bisong
Elizabeth A. Martinez
Albuquerque, NM

for Appellant

# OPINION

**BUSTAMANTE, Judge.**

{1} Joseph Lee Christopherson, individually and as personal representative of the estate of his daughter, Mercedes Louise Christopherson, filed a complaint for medical negligence leading to Mercedes Christopherson's death in 2008. A jury found St. Vincent Hospital negligent, but hung on the issue of causation. A second trial, limited to causation, resulted in a verdict in favor of St. Vincent Hospital. The district court ordered a third trial on causation based on defense counsel's misconduct during the second trial. The final trial ended in a $2.25 million verdict against St. Vincent Hospital. St. Vincent Hospital appeals.

## I.    BACKGROUND

{2} In November 2008 twenty-year-old Mercedes Christopherson (Mercedes) was hospitalized at Presbyterian Hospital in Albuquerque for acute pain in her abdomen. After approximately one week, she was discharged on November 21, 2008, and returned to Santa Fe, where she lived. However, on November 25, 2008, Mercedes was still in pain and went to the emergency room at St. Vincent Hospital where she was admitted.

{3} At St. Vincent Hospital, Mercedes was treated for pancreatitis and several possible types of infection, including an intra-abdominal infection. After a few days

Mercedes started to improve, but then, on December 6, developed a fever, increased pulse, and hypoxia (insufficient oxygen). Between December 6 and December 8, Mercedes' pain medication and antibiotics were adjusted, more tests were performed to identify whether she had one or more types of infection, and she was given oxygen to address the hypoxia.

{4}     Mercedes was discharged from St. Vincent Hospital on December 8, 2008. At the time of discharge, she had a temperature of 100.9 and slightly elevated heart rate of 107. Mercedes was advised not to drink alcohol because of possible interaction with the pain medication she was taking and to contact the hospital if she had a temperature over 101 degrees, shortness of breath, nausea, vomiting, or sudden severe weakness. She spent the evening with her girlfriend, Adrianna Bustos, and the Bustos family. According to family members, she spent "a quiet evening, eating a small meal and then going to sleep." At ten o'clock the next morning, Mrs. Bustos, Adrianna's mother, checked on Mercedes and found that she was not breathing and that there was drool or bile around her mouth. Mrs. Bustos called 911 and another person in the house began CPR. Emergency medical technicians arrived and took Mercedes to the hospital, where she was put on life support. She died the next day.

{5}     In December 2009 Mercedes' father, Plaintiff Joseph Lee Christopherson, filed suit against St. Vincent Hospital for medical negligence. An eleven-day jury trial was

held. The jury found that St. Vincent Hospital was negligent, but hung on the question of whether St. Vincent Hospital's negligence caused Mercedes' death. The district court ordered a partial retrial on the issue of causation only.

{6} The second trial—limited to causation—started in late July 2012. After a five-day trial, the jury found that St. Vincent Hospital's negligence was not the cause of Mercedes' death. Plaintiff moved for a new trial on the ground that "[t]he jury verdict was induced by misconduct of defense counsel consisting [of] statements which were intentional, irrelevant, inadmissible, unethical[,] and prejudicial." The district court granted the motion for a new trial.

{7} A third partial trial was held in December 2013. Before trial, St. Vincent Hospital moved for a full retrial of both negligence and causation, on the ground that, in order to "render a proper verdict on causation, the [t]hird [j]ury needs to know the grounds on which the [f]irst [j]ury found St. Vincent [Hospital] to be negligent, but that is not possible." The district court denied the motion, stating that "the issues of negligence, causation[,] and damages in this case are separate and distinct as defined by *Buffett v. Vargas*, 1996-NMSC-[012], 121 N.M. 507, 914 P.2d 1004." At the conclusion of the third trial, the jury found that St. Vincent Hospital's negligence was the cause of Mercedes' death and awarded $2,250,000 in compensatory damages. St. Vincent Hospital appealed.

3

## II. DISCUSSION

{8} St. Vincent Hospital's appeal presents three questions. First, whether the district court erred in limiting the second or third trials to causation only. Second, whether the district court erred in ordering a third partial trial based on defense counsel's conduct in the second trial. Third, whether a new, full retrial is necessary because the district court erred by excluding expert testimony concerning the role of Xanax and marijuana in Mercedes' death. We address these arguments in turn.

### A. The District Court Did Not Improperly Limit Retrial to Causation

{9} "The grant or denial of a new trial is a matter resting within the sound discretion of the trial court, and the reviewing court will not reverse absent a manifest abuse of that discretion." *Martinez v. Ponderosa Prods., Inc.*, 1988-NMCA-115, ¶ 4, 108 N.M. 385, 772 P.2d 1308. Under Rule 1-059(A) NMRA, the district court may order a new trial on "all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted." *Cf.* Rule 1-042(B) NMRA ("The court . . . may order a separate trial of any claim, . . . or of any separate issue or of any number of claims, . . . or issues, always preserving the right of trial by jury given to any party as a constitutional right.").

{10} Generally speaking, whether a partial trial is appropriate depends on whether the issue is "entirely separate and distinct from" the other issues already decided and

4

whether "such single issue can be determined without reference to other issues and without prejudice to either party." *Sanchez v. Dale Bellamah Homes of N.M., Inc.*, 1966-NMSC-040, ¶ 12, 76 N.M. 526, 417 P.2d 25; *see Buffett*, 1996-NMSC-012, ¶ 32 (stating that a partial retrial as to a single party is appropriate when "there is a clear showing that the issues in the case are so distinct and separable that a party may be excluded without prejudice" and that "[t]his test is the same as New Mexico's test for determining whether a partial retrial is appropriate as to some issues but not others" (internal quotation marks and citation omitted)). The test derives from a United States Supreme Court decision, *Gasoline Products Co. v. Champlin Refining Co.*, which held that "a partial retrial may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." 283 U.S. 494, 500 (1931). Rule 59 of the Federal Rules of Civil Procedure, on which our Rule 1-059 is based, was "written in the light of the *Gasoline Products* case and of state practices allowing a partial new trial." The Late Charles Alan Wright, et al., *Partial New Trial*, 11 Fed. Prac. & Proc. Civ. § 2814 (3d ed. 2016); *Martinez v. Friede*, 2004-NMSC-006, ¶ 12, 135 N.M. 171, 86 P.3d 596 (stating that "our Rule 1-059 is substantially the same as its federal counterpart with one . . . exception," which has since been superseded by rule),

5

*superseded by rule on other grounds as stated in State v. Moreland*, 2008-NMSC-031, ¶ 11, 144 N.M. 192, 185 P.3d 363.

{11}     St. Vincent Hospital's argument is that "a full retrial was required . . . because the question of causation was not 'distinct and separable' from that of negligence." Negligence and causation are not distinct, it argues, because there was no way for the second or third jury to know which conduct the first jury found negligent. In the first trial, the jury was instructed that "[t]o establish medical negligence on the part of . . . St. Vincent Hospital, . . . Plaintiff has the burden of proving that St. Vincent Hospital . . . failed to use the skill and care required in at least one of [seven] ways[.]" The "seven ways" were:

> [(1)] By failing to properly communicate observations and concerns about Mercedes['] . . . condition among Dr. Kovnat, Dr. Palestine[,] Nurse Gallagher or other nurses; or
>
> [(2)] By failing to rule out intra-abdominal infection as the cause of Mercedes['] . . . blood stream infection; or
>
> [(3)] By inadequately treating Mercedes['] . . . blood stream infection; or
>
> [(4)] By failing to assess and evaluate Mercedes['] . . . hypoxia before discharging her without supplemental oxygen; or
>
> [(5)] By failing to assess and evaluate Mercedes . . . for oversedation before discharging her; or

6

[(6)]    By failing to obtain pertinent medical information, including the December 8, 2008[,] blood culture results, prior to discharging Mercedes . . . home on December 8, 2008; or

[(7)]    By discharging Mercedes . . . home on December 8, 2008, without ongoing antibiotics.

{12}    The verdict form, however, did not require the jurors to indicate which conduct was the basis for negligence. Instead, it merely asked whether St. Vincent Hospital was negligent. St. Vincent Hospital concludes that because the finding of negligence could have been based on any one of the seven identified ways, and the later juries could not know which conduct was found negligent, it was impossible for them to tie the negligence finding to the cause of Mercedes' death.

{13}    St. Vincent Hospital's argument has some intuitive appeal. Indeed, a number of courts in other jurisdictions have concluded under similar facts that a partial retrial on causation only is inappropriate. We begin by outlining the relevant cases. Because we conclude that none of the cases cited by the parties fully resolves the issue here, we examine principles governing appellate review of jury verdicts. We conclude that the district court did not err in ordering a partial retrial on causation under the facts of this case.

**Case Law on Partial Trials**

{14}    No New Mexico case directly addresses a partial retrial on causation. In *Scott v. McWood Corp.*, our Supreme Court considered whether a new trial on contributory

7

negligence was appropriate. 1971-NMSC-068, ¶ 10, 82 N.M. 776, 487 P.2d 478. In an earlier appeal, the Supreme Court had remanded to the district court for a new trial on the plaintiffs' claim, and the district court limited the retrial to the issue of contributory negligence. *Id.* ¶¶ 1, 10; *see Scott v. Murphy Corp.*, 1968-NMSC-185, ¶ 14, 79 N.M. 697, 448 P.2d 803. After the jury found in favor of the plaintiffs, the district court ruled that the plaintiffs were contributorily negligent as a matter of law and therefore barred from recovery, and entered a judgment for McWood Corporation notwithstanding the jury's verdict. *McWood Corp.*, 1971-NMSC-068, ¶¶ 2-3. The plaintiffs appealed the judgment notwithstanding the verdict and the defendant cross-appealed, arguing that retrial only on the appellant's contributory negligence was error. *Id.* The Court held that contributory negligence is a factual question that should have been submitted to the jury, reversed the judgment on that ground, and ordered a new trial on that issue only. *Id.* ¶¶ 8, 14. In addition, it rejected the defendant's arguments and held that the defendant's "primary negligence had been determined by properly submitted interrogatories" and hence the district court did not err in ordering that its negligence did not need to be retried. *Id.* ¶ 10.

{15}     Although it did not use this language, we conclude that the Court determined that the issue of the plaintiffs' contributory negligence was distinct and separable from the defendant's negligence. Plaintiff argues that *Scott* supports a partial retrial

8

here. But *Scott*'s holding is of limited use here because it addressed contributory negligence. *See* NMSA 1978, § 41-3A-1 (1987) (adopting comparative negligence doctrine except in limited circumstances). Under the contributory negligence doctrine, even the tiniest bit of contributory negligence on the plaintiffs' part would have prevented the plaintiffs' recovery. *Commercial Union Assurance Cos. v. W. Farm Bureau Ins. Cos.*, 1979-NMSC-082, ¶ 4, 93 N.M. 507, 601 P.2d 1203 ("[C]ontributory negligence [is] a bar to recovery in a tort action."). As such, the question of whether the plaintiffs were contributorily negligent did not involve comparing the negligence of the parties and apportioning fault, nor did it involve assessing the causal relationship between the defendant's negligence and the plaintiffs' injury.

{16}     *Sanchez v. Wiley* too is unhelpful. 1997-NMCA-105, 124 N.M. 47, 946 P.2d 650. In that case, this Court approved a partial retrial on punitive damages because "[t]he focus of the retrial would be different from the focus of the trial on compensatory damages, at which the jury decided the issues of injury, loss, and allocation of fault. At a trial on punitive damages, the emphasis would be on [the d]efendants' behavior and whether that behavior should be punished." *Id.* ¶ 10. The analysis there depended on whether the defendant would be prejudiced by a partial retrial. The Court stated, "Prejudice does not result merely because there may be

9

overlap in the evidence, particularly when, as in this case, there is no possibility that the error alleged on appeal (failing to allow the punitive damages issue to go to the jury) could have affected the compensatory damages award." *Id.*

{17}   We turn to cases from other jurisdictions. In *Conklin v. Hannoch Weisman*, 678 A.2d 1060 (N.J. 1996), the New Jersey Supreme Court examined whether retrial on both negligence and causation was required where the first jury had found the lawyer-defendants negligent in advising their clients. *Id.* at 1067. Framing the question as "whether the first jury's finding that [the] defendants had failed properly to inform [the] plaintiffs of the risks of subordination should be binding on a jury at retrial[,]" the court stated that "[a]lthough the jury's finding of negligence . . . very well may have been unaffected by error, [it had] no way of knowing precisely what conduct the jury based that finding on" and therefore "[could not] say that the jury's finding of negligence was entirely distinct and separable from the issue of proximate cause." *Id.* The jury verdict form, similar to that here, merely asked the first jury whether the defendants were negligent "in representing the [plaintiffs] in connection with explaining subordination and the risks associated with subordination[.]" *Id.* at 1064. The court concluded that this verdict form created problems for retrial, stating "[t]he concrete question is what precisely were the jury's factual findings and how would those findings relate to the issues of causation." *Id.* at 1068.

For example, the attorneys' negligence may have consisted in giving no explanation of subordination at all (plaintiffs' basic theory), an incomplete explanation (one witness said that [one attorney] told one of the plaintiffs that subordination means that the bank gets paid first), or an unartful explanation couched in legal jargon rather than in the plain language necessary to impart its meaning to lay clients (a theory of one of the experts). How then might the court at retrial pose the issue to the jury? We foresee too many problems of repeat error if the terse language of the jury findings is translated into background circumstances that may or may not have been what the first jury intended to convey.

*Id.*; *see Henebema v. S. Jersey Transp. Auth.*, 99 A.3d 336, 343 (N.J. 2014) (analyzing *Conklin* and stating that *Conklin* "addressed circumstances where there existed the real potential that jury confusion could undermine confidence in a second jury's verdict on causation if that second jury did not understand the basis for the first jury's findings on negligence"). The *Conklin* court also stated that because "[a] jury verdict in a civil tort claim ordinarily consists of two components, a finding of negligent conduct and a finding of damages proximately caused by that conduct[, n]egligence, . . . is usually inextricably intertwined with the concept of proximate cause." 678 A.2d at 1067.

{18}  A similar case is *Carbis Sales, Inc. v. Eisenberg*, 935 A.2d 1236, 1250-51 (N.J. Super. Ct. App. Div. 2007), in which the New Jersey Superior Court ordered retrial on all issues where the evidence supported two different theories of legal malpractice but the first jury verdict did not specify the basis on which the jury found malpractice. It stated,

11

> [T]he only way for a [second] jury on remand to determine what losses were proximately caused by which facets of [the attorney's] malpractice is for them to hear what that malpractice consisted of. That is, they would have to essentially hear the entire case on liability. Accordingly, the remedy on plaintiffs' cross-appeal is a remand for a new trial as to all issues and all parties.

*Id.* at 1251; *but see Tindal v. Smith*, 690 A.2d 674, 682 (N.J. Super. Ct. App. Div. 1997) (holding that negligence and proximate cause could be tried separately because, "based on the evidence, the two issues were entirely distinct and separate" and "[i]n his instructions to the jury, the judge charged on negligence separately from proximate cause").

{19}    In California, a plaintiff sued a city for sexual harassment and retaliation. *Lewis v. City of Benicia*, 169 Cal. Rptr. 3d 794, 799 (Ct. App. 2014). As to the retaliation claim, a jury found that "[the plaintiff's] participation in protected activity was a motivating reason for [the c]ity's adverse actions, but . . . [the c]ity's conduct was not a substantial factor in causing harm to [the plaintiff]." *Id.* at 800. The verdict form echoed the elements of a retaliatory discharge claim. *Id.* at 808. The California Court of Appeals held that the district court improperly excluded evidence at trial related to retaliation and remanded for retrial. *Id.* at 812. The plaintiff argued for "a limited retrial on the causation-of-harm element, and [leaving] intact the jury's findings in [the plaintiff's] favor on other elements of the retaliation cause of action." *Id.* The court rejected this argument on two bases. First, it held, based on California law, that

12

courts are not permitted to "enter a partial special verdict that fails to dispose of all elements necessary to establish liability on a single cause of action." *Id.* at 813; *see* Cal. Civ. Proc. Code § 624 (1872) (stating that on a special verdict form "conclusions of fact must be so presented as that nothing shall remain to the [c]ourt but to draw from them conclusions of law"). It concluded, "[a] reversal of just the jury's adverse finding on the causation-of-harm element (the relief apparently sought by [the plaintiff]) would leave a partial special verdict consisting of the jury's responses on only some elements of the retaliation cause of action and would not establish [the c]ity's liability on that claim." *Lewis*, 169 Cal. Rptr. 3d at 813.

{20} More relevant to our purpose, the court held that "a partial retrial on the causation-of-harm element would cause confusion and uncertainty and would be prejudicial to [the c]ity" because

> [a] second jury would have to determine whether [the c]ity's retaliatory acts caused harm to [the plaintiff], but the second jury would not know which of [the c]ity's alleged acts (e.g., termination of the plainitiff's employment at the end of his paid internship, false accusations of misconduct after he returned as a volunteer, interference with his workers' compensation claim) the first jury determined were retaliatory.

*Id.* It concluded that "[a] full retrial on the retaliation claim is necessary." *Id.*

{21} Finally, in *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 709 (2d Cir. 1983), the Second Circuit Court of Appeals held that the district court properly ordered a new trial on all issues after a jury found violation of a statute ("Robinson-

Patman") but hung on the issue of causation. There, the complaint alleged "price differentials" related to a number of products, but it was not clear which products were the basis for the first jury's finding that the price fixing statute had been violated. *Id.* The court stated,

> The first jury had not been asked to, nor did it, specify the products as to which it found [the] defendants had violated the Robinson-Patman Act. The second jury thus could hardly have fathomed the issues of causation and injury to [the plaintiff] without considering the extent of the violation. Hence the court properly concluded that the second trial should include all Robinson-Patman issues.

*Id.*

{22}    None of these cases satisfactorily address the issues posed by the arguments here. Several merely state that a partial trial on causation is improper because causation is intertwined with negligence, with little explanation, and with little deference to the trial court's decision, in spite of lip service to the abuse of discretion standard of review. Other holdings rest on the second jury's lack of knowledge about the precise basis of the first jury's verdict but include no discussion of other principles governing treatment of jury verdicts. For instance, even though California adheres to the "general verdict rule," discussed further below, it does not explain in *Lewis* how that rule operates in the context of partial retrials. *See McCloud v. Roy Riegels Chems.*, 97 Cal. Rptr. 910, 915 (Ct. App. 1971) (discussing the general verdict rule in California). Similarly, it is not clear in the cases described above

14

whether those jurisdictions require juries to agree on the factual underpinnings of a cause of action or merely on its elements, and how the approach to review of jury verdicts might impact the propriety of partial retrials. Because we conclude that these principles are integral to review of St. Vincent Hospital's arguments, we discuss them next.

**The General Verdict Rule and Jury Unanimity**

{23}     We consider the first verdict here a general verdict in spite of its label as a "special verdict." Although labeled "special," the questions were very general. First, the jury was asked, "Were either [St. Vincent Hospital and/or Dr. Palestine] negligent?" The jury was then asked whether St. Vincent Hospital's negligence was the cause of Mercedes' injury. In *Bustos v. Hyundai Motor Co.*, a case dealing with liability for an automobile accident death, this Court held that a verdict similar to this was a general verdict. 2010-NMCA-090, ¶ 47, 149 N.M. 1, 243 P.3d 440.

> The jury . . . was not requested to find whether the roof or doors specifically were defective or how [the d]efendants were specifically negligent. The questions asked were general: "Was there a defect in the 2002 Hyundai Accent?" "Did Hyundai breach the implied warranty of merchantability?" "Was Hyundai negligent?" In that regard, the special verdict form in this case amounted to a general verdict.

*Id.*

{24}     Consistent with *Bustos*, we treat the verdict here as a general verdict. *See Dessauer v. Mem'l Gen. Hosp.*, 1981-NMCA-051, ¶ 16, 96 N.M. 92, 628 P.2d 337

15

(holding that a verdict form that "was determinative of the right of the [plaintiffs] to recover damages from the [defendant] as an alleged tortfeasor, that answer is the equivalent of, and is to be given effect as, a general verdict" despite not being labeled as such).

{25} Under the "general verdict rule," "[a] general verdict may be affirmed under any theory supported by evidence unless an erroneous jury instruction was given." *Bustos*, 2010-NMCA-090, ¶ 48. In *Bustos*, for example, the defendant argued that an issue of a defective door latch should not have been presented to the jury because it was not supported by substantial evidence. *Id.* ¶ 47. This Court held that, even if it assumed there was error in presenting this argument to the jury, the verdict could nevertheless be affirmed based on theories that were supported by the evidence.

> In this situation, we must assume the jury accepted the theory argued by counsel that was supported by substantial evidence. Assuming there was insufficient evidence of causation between any door-latch defect and [the decedent]'s injuries, we assume the jury did not rely on the door for its finding of product defect and negligence.

*Id.* ¶ 49; *cf. Curry v. Burns*, 626 A.2d 719, 721 (Conn. 1993) (stating that the "general verdict rule provides that, if a jury renders a general verdict for one party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party"); 89 C.J.S. *Trial* § 1114 (2016) ("The so-called 'general verdict rule' provides that if a jury renders a general verdict for one

16

party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party.").

{26} Applying the general verdict rule here would permit us to affirm the first jury's verdict as to negligence on any of the seven theories advanced by Plaintiff so long as they are supported by the evidence. Importantly, St. Vincent Hospital does not challenge any of the seven theories on sufficiency of the evidence grounds nor assert any error in the jury instructions in the first trial. In the absence of such a challenge, we assume all seven theories are supported by the evidence. Rule 12-213(A)(4) NMRA ("A contention that a verdict, judgment or finding of fact is not supported by substantial evidence shall be deemed waived unless the argument [in the brief in chief] identifies with particularity the fact or facts that are not supported by substantial evidence[.]").

{27} St. Vincent Hospital does, however, make the finer point that there is no way to know whether at least ten jurors found it negligent in precisely the same way. In other words, it maintains that some jurors may have found it negligent as to one of the seven theories while different jurors found it negligent on a different theory. Consequently, there is no way to know if at least ten jurors agreed on the basis for the verdict. Hence, it argues, it would be error for subsequent juries to assume negligence was found in "at least one" of the seven theories.

17

{28}     We do not agree that unanimity among the first jury members on the factual basis for a finding of negligence is a prerequisite to validity of the verdict or later juries' reliance on that verdict. In the criminal arena, "where alternative theories of guilt are put forth under a single charge, jury unanimity is required only as to the verdict, not to any particular theory of guilt." *State v. Godoy*, 2012-NMCA-084, ¶ 6, 284 P.3d 410; *see State v. Salazar*, 1997-NMSC-044, ¶ 32, 123 N.M. 778, 945 P.2d 996 (stating that "a jury's general verdict will not be disturbed in such a case where substantial evidence exists in the record supporting at least one of the theories of the crime presented to the jury"). Other courts have applied this rule in the civil context. Addressing a question similar to that here, the California Court of Appeal observed, "Generally, [the] criminal law system places greater burdens on the plaintiff or prosecutor to prove a case against a defendant than does our civil law system." *Stoner v. Williams*, 54 Cal. Rptr. 2d 243, 251 (Ct. App. 1996). As examples, the *Stoner* court noted that the burden of proof is greater in criminal trials, a criminal verdict must be unanimous, and "the types of evidence admissible are generally more restricted in criminal cases than in civil cases." *Id.* Stating that "the question of jury agreement in civil cases should . . . not be more onerous on the civil plaintiff than on the criminal prosecutor[,]" *id.* at 251-52, it concluded that, just like in criminal cases, "jurors [in civil cases] need not agree from among a number of alternative acts which act is

18

proved, so long as the jurors agree that each element of the cause of action is proved." *Id.* at 252.

{29} The Kansas Supreme Court took a more direct route to the same effect. In *Cleveland v. Wong*, the jury was instructed on six different alleged bases for negligence. 701 P.2d 1301, 1307 (Kan. 1985). After the jury found in favor of the plaintiff, the defendant appealed, arguing that the instructions "permitted the jurors to agree that the defendant was negligent without agreeing upon a specific act of negligence." *Id.* The court disagreed that the jurors were incorrectly charged. It stated:

> In a surgical malpractice case, if half of the jurors believe that the surgeon left a sponge in the incision and the other half believe that he left gauze rather than a sponge in the patient, and assuming that the evidence would support either finding and that the surgeon's omission caused the damage, should recovery be denied? We think not.

*Id.* at 1308.

{30} The Kansas Supreme Court concluded that "[i]f a jury finds a defendant negligent *in one or more* of the claims of negligence upon which there is competent substantial evidence, and further finds that the plaintiff sustained damages as a direct result of the defendant's negligence, that is sufficient" and that "[u]nanimity upon the specific negligent act or omission is not required." *Id.* at 1308-09; *see* Elizabeth A. Larsen, Comment, *Specificity and Juror Agreement in Civil Cases*, 69 U. Chi. L. Rev.

19

379, 388-92 (2002) (discussing juror agreement generally as well as *Stoner* and *Cleveland*).

{31} We agree with the reasoning in these cases. Given that our criminal case law is clear that a jury need not agree on the theory underlying guilt or the factual basis of a single charge, we agree with the *Stoner* court that the principle readily applies in civil cases as well, where the burden of proof is lower and the unanimity requirements less stringent. *Compare, e.g.*, Rule 5-611(A) NMRA (requiring a unanimous verdict in criminal cases), *with* Rule 1-038(G) NMRA (requiring that ten out of twelve jurors agree in civil cases).

{32} The leading case addressing jury unanimity in civil cases in New Mexico is *Naumburg v. Wagner*, 1970-NMCA-019, 81 N.M. 242, 465 P.2d 521. In that case, this Court addressed a related question: "Must the same ten jurors agree on each material issue that supports a verdict or may agreement of any ten jurors on any issue constitute a finding as to that issue?" *Id.* ¶ 4. There, eleven jurors found only the defendant negligent, but one found that both defendant and plaintiff were negligent. *Id.* ¶ 2. (At that time, a finding of contributory negligence would have barred recovery entirely. *Id.* ¶ 19.) Nevertheless, the twelfth juror proceeded to consider and vote on the issue of damages. *Id.* ¶ 2. Two jurors who had found negligence disagreed on the measure of damages. *Id.* On appeal, the defendant argued that the verdict against her

20

was invalid for two reasons. First, because the juror who voted against negligence should not have considered damages, and second, because the exclusion of that juror's vote coupled with the two votes against damages meant that fewer than ten jurors had agreed on the amount of damages. *Id.* ¶¶ 1, 4. Construing what is now Rule 1-038(G), the Court disagreed that the twelfth juror's vote on damages was error and held that "a verdict must be received by the court when at least ten jurors, not necessarily the same ten, agree to each material finding supporting that verdict provided, however, that none of the jurors . . . is guilty of irreconcilable inconsistencies or material contradictions when his votes on all issues are considered." *Naumburg*, 1970-NMCA-019, ¶ 5; *see* UJI 13-2006 NMRA ("The jury acts as a body. Therefore, on every question on the verdict form which the jury must answer it is necessary that all jurors participate regardless of the vote on another question. Before a question can be answered, at least [five] [ten] of you must agree upon the answer; however, the same [five] [ten] need not agree upon each answer." (alterations in original)). This conclusion puts New Mexico among the states ascribing to the "any majority rule." *See* David A. Lombardero, *Do Special Verdicts Improve the Structure of Jury Decision-Making?*, 36 Jurimetrics J. 275, 298 (1996) (describing the "any majority rule" as "all jurors vote on every issue, regardless of their votes on other issues. Any juror's votes need not be logically consistent from

21

issue to issue. Plaintiff prevails if the specified number of jurors find in her favor on each element" and stating that New Mexico has adopted a modified version of the rule.).

{33}     The issue in *Naumburg* was juror agreement on each element of the cause of action: liability and damages. Thus, it differs from the question here. The focus here is on the factual bases underlying a particular element: negligence. *See Hendrix v. Docusort, Inc.*, 860 P.2d 62, 67 (Kan. Ct. App. 1993) (discussing the "any majority rule" and calling the issue of juror agreement on the factual bases for negligence "a related question"). Nevertheless, the principle in *Naumburg* supports our conclusion that a jury need not agree on the factual ground on which a negligence finding is based.

{34}     In sum, under the general verdict rule, we assume that all seven theories of negligence are supported by the evidence and that the first jury's verdict therefore could validly rest on any one (or more) of those bases. Moreover, the first jury was not required to agree on which of the seven bases informed its finding of negligence. Taken together, these principles undermine our sister states' concerns about a second jury being unaware of the factual bases for a prior jury's negligence finding. We conclude, based on the operation of the general verdict rule and rules on jury

22

unanimity, that the district court did not err in ordering a partial trial limited to causation.

**B.     The District Court Did Not Err in Ordering a Third Partial Trial**

{35}     Because it prevailed in the second trial, St. Vincent Hospital attempts to thread a very small needle by arguing that only the third partial retrial was erroneously limited to causation, that the district court erred in ordering a third trial based on St. Vincent Hospital's misconduct, and that the verdict from the second trial should be reinstated. Because we have concluded that the district court did not err in limiting either the second or third trials to causation, we proceed to consider whether St. Vincent Hospital's conduct during the second trial warranted a third trial.

{36}     "It is for the trial court to determine whether there has been prejudicial misconduct requiring a mistrial." *Chavez v. Atchison, Topeka. & Santa Fe Ry. Co.*, 1967-NMSC-012, ¶ 32, 77 N.M. 346, 423 P.2d 34. We will reverse a ruling on a motion for a new trial only if the district court clearly abused its discretion. *Grammer v. Kohlhaas Tank & Equip. Co.*, 1979-NMCA-149, ¶ 40, 93 N.M. 685, 604 P.2d 823. The district court's discretion in this regard is broad: "The trial court, having seen and heard all that takes place on the trial, and having better opportunities for the ascertainment of the merits of the case, is allowed a wide latitude . . . in determining

motions for new trial[.]" *Henderson v. Dreyfus*, 1919-NMSC-023, ¶ 79, 26 N.M. 541, 191 P. 442 (internal quotation marks and citation omitted).

{37} A new trial based on counsel misconduct is warranted if the conduct was improper, and "it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case." *Apodaca v. U.S. Fid. & Guar. Co.*, 1967-NMSC-250, ¶ 8, 78 N.M. 501, 433 P.2d 86 (internal quotation marks and citation omitted). "The burden is upon a party claiming error to demonstrate that his rights were prejudiced by the claimed error." *Id.* ¶ 7.

{38} The district court's order granting a new trial listed eight specific instances of improper questions, comments, or demeanor by St. Vincent Hospital's counsel. The eight instances mentioned in the order were as follows:

> 5. Contrary to the [c]ourt's prior rulings, comparative fault issues were raised on the juror questionnaires submitted to the jury venire by [St. Vincent Hospital];
>
> 6. Twice during [o]pening [s]tatement, [d]efense counsel attempted to interject standard of care and negligence issues into the case contrary to express rulings of the [c]ourt;
>
> 7. Defense counsel made two quite inappropriate comments in front of the jury panel during the voir dire phase of the trial;
>
> 8. In a very short period of time during Dr. Kovnat's examination, [d]efense counsel posed no less than seven questions, in immediate succession, going directly to negligence or standard of care issues contrary to the [c]ourt's rulings. There was no good faith basis for

24

those questions. The purpose appeared to be to undermine the previous jury's verdict or to call into question the Court's proper rulings;

9. There were at least four improper impeachment questions directed to Ms. Bustos by [d]efense counsel;

10. Defense counsel made numerous improper objections and questions during Dr. Cheng's testimony, and two improper questions or comments regarding Dr. Reichard;

11. Defense counsel made improper, gratuitous comments with regard to Dr. Allen's testimony which were audible throughout the courtroom;

. . . .

13. Defense counsel made two improper comments during closing which should not have been interjected and were violative of the Court's express and repeated rulings[.]

(Emphasis omitted.)

{39} The district court noted that "[d]efense counsel was warned a number of times, at bench conferences and outside the presence of the jury, about inappropriate comments, inappropriate questions and demeanor." In addition, the district court's order stated that "[t]he entirety of Plaintiff's arguments in his [m]otion for [a n]ew [t]rial were well-taken, and the other portions of those arguments not already specified herein are adopted[.]" Plaintiff's motion alleged fifty-five instances of improper questioning or behavior during the trial and hearings. On appeal, we determine whether the district court could reasonably conclude that the conduct

25

identified "transgressed the grounds of professional duty or constituted prejudicial misconduct in argument presented to the jury." *Enriquez v. Cochran*, 1998-NMCA-157, ¶ 132, 126 N.M. 196, 967 P.2d 1136 (internal quotation marks and citation omitted).

{40} St. Vincent Hospital does not dispute that the alleged conduct occurred. Instead, it argues that defense counsel's questioning, comments, and behavior during trial did not amount to misconduct, much less conduct requiring a mistrial. It also maintains that, even if some of the defense counsel's comments or questions were improper, they did not have any impact on the jury's verdict.

{41} St. Vincent Hospital's approach is to deal with each instance of asserted misconduct separately and explain why it could not by itself be improper or prejudicial. Having dealt with them separately it then argues that there could be no cumulative effect. The district court apparently disagreed.

{42} At the hearing on the motion for a new trial, the district court noted that defense counsel's repeated questioning, in spite of the court's rulings on Plaintiff's objections to the questions, did not constitute good faith. Instead, it found that "the purpose appeared to [be] to undermine or call into question the previous jury's verdict in this case, or to undermine and call into question the [c]ourt's proper . . . rulings in this case." It also stated that defense counsel's conduct was "contrary to the express

rulings of the [c]ourt" and, in at least some cases, an attempt to convey to the jury "unhappiness or dissatisfaction" with the court's rulings. Such conduct is potentially violative of Rule 16-304(C) NMRA of the Rules of Professional Conduct, which provides that an attorney shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]" *See Murphy v. Int'l Robotics Sys., Inc.*, 710 So. 2d 587, 591 n.5 (Fla. Dist. Ct. App. 1998) (discussing the rules of professional conduct that might be violated by improper argument), *decision approved sub nom.* 766 So. 2d 1010 (Fla. 2000); *cf.* Rule 16-305(A) NMRA ("A lawyer shall not . . . seek to influence a judge, juror, prospective juror or other official by means prohibited by law."). Finally, the district court recognized the rarity of new trials based on misconduct, stating, "I'll note for the record that I've been a judge for approximately seven-and-a-half years, and this is the first, I repeat the first time I have granted a new trial. But I think—and I find that the circumstances of this case warrant this extraordinary relief."

{43} St. Vincent Hospital's arguments invite this Court to second-guess the district court's assessment of defense counsel's conduct and its impact. This we will not do. A district court "hears the entire trial and is in the best position to determine the prejudicial effect of attorney misconduct on the jury[.] Accordingly, [the c]ourt will not lightly disturb its ruling[.]" *O'Connor v. George*, 2015 MT 274, ¶ 17, 381 Mont.

27

127, 357 P.3d 323 (internal quotation marks and citations omitted). We affirm the district court's order for a new (third) trial.

## C.    The District Court Did Not Err in Excluding Expert Testimony

{44}    On motion by Plaintiff, the district court excluded testimony by Dr. Steven Pike, a toxicologist. Dr. Pike intended to testify to the effect that Xanax and marijuana contributed to Mercedes' death. The district court ruled that

> Dr. Pike's opinion[]s as to both marijuana and Xanax contributing to Mercede[s]' demise lack foundation as to dosage, both what dosages were taken and when. Further, the opinions lack the necessary foundation of what the interaction is between the two drugs and together with other drug[]s in [Mercedes'] system.

{45}    As to Xanax, Dr. Pike testified that Xanax can have a depressant effect on respiration. He stated that, in the presence of other drugs, especially opioids, benzodiazepines like Xanax "become extremely potent respiratory depressants in combination with other drugs." However, he also testified that "[d]ose determines the poison" and that it was impossible to state whether Fentanyl, which was prescribed to Mercedes, was more or less likely to cause respiratory depression than Xanax without knowing the dose of each drug. Comparing the respiratory depressant potential of benzodiazepines to that of Benadryl, he stated, "Again, it's a question of dose." He then stated that he did not know how much Xanax Mercedes had in her system at the time of death and that there was no way of knowing in the absence of

a witness's statement about the quantity Mercedes took. He acknowledged that one test detecting the presence of benzodiazepines was post-mortem and of Mercedes' bile, which "is a concentrating organ." In an affidavit, he opined, based on a test of Mercedes' urine, that Mercedes "had to have ingested . . . []Xanax[] within [forty-eight] hours" of the test, which was conducted within two hours of the time Mercedes was found not breathing by Mrs. Bustos. He stated that Xanax, Fentanyl, and the other drugs found in Mercedes' system "would have been contributory factors, given an appropriate dose."

{46}     As to marijuana, Dr. Pike testified that "marijuana, itself, has some degree of respiratory depression, not a very large degree, but [it] certainly would be a contributing factor." He stated that the quantity of marijuana (or, more precisely, delta 9-tetrahydrocannabinoid) in Mercedes' urine indicated active, not passive, ingestion or inhalation. He acknowledged that "we have no data about how much she took of anything other than the Fentanyl."

{47}     St. Vincent Hospital argues that the exclusion of Dr. Pike's testimony was error. Generally, the district court's rulings as to admissibility of expert testimony are reviewed for an abuse of discretion. *State v. Downey*, 2008-NMSC-061, ¶ 24, 145 N.M. 232, 195 P.3d 1244. Expert testimony is governed by Rule 11-702 NMRA, which provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

{48} Essentially, Rule 11-702 contains three requirements: "(1) that the expert be qualified; (2) that the testimony be of assistance to the trier of fact; and (3) that the expert's testimony be about scientific, technical, or other specialized knowledge with a reliable basis." *Downey*, 2008-NMSC-061, ¶ 25. As the parties do not dispute Dr. Pike's qualifications, our focus is on the latter two requirements. "Pursuant to Rule 11-702, the district court is required to act as a 'gatekeeper' to ensure that an expert's testimony rests on both a reliable foundation and is relevant to the task at hand so that speculative and unfounded opinions do not reach the jury." *Parkhill v. Alderman-Cave Milling & Grain Co. of N.M.*, 2010-NMCA-110, ¶ 12, 149 N.M. 140, 245 P.3d 585. One way to avoid speculative opinions is to require an expert's opinion to be based on or relate to the facts of the case. *Downey*, 2008-NMSC-061, ¶ 30 ("One aspect of relevance is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." (internal quotation marks and citation omitted)).

{49} The district court cited a series of cases in support of its ruling, including *Parkhill* and *Downey*. We therefore discuss those cases next.

{50} The question of whether an expert's opinion was sufficiently tied to the facts was addressed recently in *Downey*. There, the state sought to admit testimony as to the defendant's blood alcohol content (BAC) at the time of a traffic accident, where the sole BAC test was conducted six hours after the accident. 2008-NMSC-061, ¶ 13. Based on retrograde extrapolation, "which calculates an individual's prior BAC level on the basis of a subsequently administered BAC test[,]" *id.*, the expert proposed to testify that the defendant "had a BAC in the range of .075 to .11 at the time of the collision." *Id.* ¶ 16. The expert's conclusions were based on a series of assumptions about the timing of the defendant's last drink and whether the defendant was in the pre-absorption, peak, or post-absorption phase of the BAC curve at the time of testing. *Id.* ¶ 32.

{51} The district court admitted the expert's testimony and this Court affirmed in a divided opinion. *Id.* ¶¶ 19, 22. On certiorari, the Supreme Court reversed. Relying on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), the Court noted that "[t]he primary inquiry is whether the scientific methodology 'fits' the facts of the case and thereby proves what it purports to prove." *Downey*, 2008-NMSC-061, ¶ 30. It continued, "Accordingly, for scientific evidence to be admissible under Rule 11-702, 'the reasoning or methodology underlying the testimony [must not only be] scientifically valid,' it also must be 'properly . . . applied to the facts in issue.' " *Id.*

31

(alterations in original) (emphasis omitted) (quoting *Daubert*, 509 U.S. at 592-93). While the Court acknowledged that experts often base their opinions on factual assumptions, it also stated that "those assumptions in turn must find evidentiary foundation in the record." *Downey*, 2008-NMSC-061, ¶ 34. It concluded that,

> [g]iven that [the expert] did not have the facts necessary to plot [the d]efendant's placement on the BAC curve, he could not express a reasonably accurate conclusion regarding the fact in issue: whether [the d]efendant was under the influence of intoxicating liquor at the time of the collision. [The expert]'s testimony did not 'fit' the facts of the . . . case because he simply assumed for the purpose of his relation-back calculations that [the d]efendant had ceased drinking prior to the collision and, therefore, was post-absorptive.

*Id.* ¶ 33. Because "the [s]tate did not produce any evidence regarding when [the d]efendant last consumed alcohol, much less the quantity consumed, [the expert]'s assumption [was] mere guesswork in the context of [that] particular case." *Id.* ¶ 34.

{52}     In *Parkhill*, this Court considered whether the district court erred in excluding expert testimony on the relationship between the plaintiffs' illnesses and exposure to an additive (monensin) in horse feed. 2010-NMCA-110, ¶ 7. The district court had ruled that the expert's conclusion that monensin had caused the plaintiffs' illnesses was insufficiently tied to the facts of the case because "in order for [the expert] to apply his reasoning or methodology reliably to the facts in the present case, [his] opinion must be based on some quantification of the dose of monensin received by

32

the [plaintiffs]." *Id.* ¶ 37. Because the expert did not have such data, his opinion was irrelevant to the case at hand. *Id.* ¶ 36. On appeal, this Court affirmed, stating that, although the expert acknowledged that dosage was important, "[the expert] did not attempt to quantify the dose of monensin received by the [plaintiffs], nor did he make any statement to the effect that it was not possible to quantify the dose of monensin to which the [plaintiffs] had been exposed." *Id.* ¶ 38.

{53}    St. Vincent Hospital argues that the district court's exclusion of Dr. Pike's testimony was error because (1) Dr. Pike was permitted to rely on circumstantial evidence in his conclusions, and (2) the district court misread *Parkhill*. We disagree. Dr. Pike testified specifically that the lethality of benzodiazepines and other drugs is dose-dependent. Although he stated that benzodiazepines in combination with other drugs can be dangerous, in light of his testimony about the importance of dosage, we cannot conclude that the district court abused its discretion in finding Dr. Pike's testimony too speculative or conjectural to be helpful to the jury, consistent with *Downey* and *Parkhill*. *See Parkhill*, 2010-NMCA-110, ¶ 38 (affirming the exclusion of evidence where the expert there agreed that the dosage was critical to causation, but failed to quantify the dosage received by the plaintiffs). Similarly, with respect to marijuana, Dr. Pike had no knowledge of the quantity of marijuana consumed and testified only that marijuana generally could have a mild depressive effect on

33

respiration. It was not an abuse of discretion to find this testimony too amorphous to assist the jury. *See Downey*, 2008-NMSC-061, ¶ 32 ("Expert testimony may be received if, and only if, the expert possesses such facts as would enable him to express a reasonably accurate conclusion as distinguished from mere conjecture." (internal quotation marks and citation omitted)).

{54} St. Vincent Hospital also argues that the district court misinterpreted *Parkhill*. It maintains that "*Parkhill* stands only for the proposition that where evidence of dosage is available, then an expert must consider it." However, when dosage is not available, it argues, "then an expert may rely on his or her experience, training, skill, education, or knowledge, and apply it to the circumstantial evidence available." St. Vincent Hospital points to the fact that the *Parkhill* Court distinguished out-of-state cases permitting circumstantial evidence of causation by stating that those "cases [were] not applicable to the circumstances [in *Parkhill*] because direct evidence of . . . dosage *could have been* obtained." *Parkhill*, 2010-NMCA-110, ¶ 43 (emphasis added). It argues that those cases should apply here because direct evidence of dosage was unobtainable. We decline to interpret *Parkhill* as stating an absolute rule that obtainable direct evidence of dosage must be considered by an expert to support causation, but that where such evidence is not obtainable, circumstantial evidence will suffice. Instead, we adhere to the underlying principle in both *Parkhill* and

34

*Downey*, which is that the relevance of an expert's opinion depends on its connection to the facts of the case. *Downey*, 2008-NMSC-061, ¶ 30; *Parkhill*, 2010-NMCA-110, ¶ 36. Where those facts require dosage data in order to render the expert's opinion relevant, the district court acts within its discretion to exclude testimony not based on such data.

{55} Finally, St. Vincent Hospital also referred this Court to *Acosta v. Shell Western Exploration & Production, Inc.*, 2016-NMSC-012, 370 P.3d 761, which was decided after briefing was complete in the present matter. In *Acosta*, the New Mexico Supreme Court reversed this Court's affirmance of the district court's exclusion of expert testimony on the ground of the "analytical gap" between the animal studies relied on by the expert and the effects felt by the plaintiffs in that case. *Id.* ¶¶ 26, 36. The Supreme Court held that exclusion of the expert's testimony was error because assessment of any gap between the animal studies and application to the plaintiffs was within the jury's purview. It stated, "When the district court found that [the expert's] study 'fail[ed] to bridge the gap from association to causation,' it improperly blurred the line between the district court's province to evaluate the reliability of [his] methodology and the jury's province to weigh the strength of [his] conclusions." *Id.* ¶ 41 (second alteration in original) (citation omitted). By submission of this opinion, we understand St. Vincent Hospital to be arguing that, under *Acosta*, it was within the

jury's purview to assess the impact of the lack of dose information on the weight of Dr. Pike's testimony.

{56}     We are not persuaded that *Acosta*'s holding applies here for several reasons. First, *Acosta* was a toxic tort case and the issue there was whether the plaintiffs' injuries were caused by exposure to contaminants associated with the defendant's oil operations. *Id.* ¶ 5. The specific question related to expert testimony was "whether the associations revealed by [the expert's] own study, the animal studies, and other published studies regarding chemical exposure provided reliable support for an inference of causation in humans." *Id.* ¶ 40. Thus, the question there had to do with general causation. *Id.* ¶ 29 (discussing general and specific causation in toxic tort cases and stating that the district court never reached the question of specific causation). The analogous question in this case would be whether benzodiazepines in sufficient doses cause respiratory depression. This question is not in dispute. Instead, the question here is one of specific causation: whether Mercedes received a sufficient dose. The difference in the focus of the inquiry makes *Acosta* inapposite here. Second, even if *Acosta*'s principle could be readily applied here, it is factually different as well. Unlike here, the expert in *Acosta* had calculated the dose of the contaminants received by the plaintiffs. *Id.* ¶ 40.

36

{57} Finally, to the extent St. Vincent Hospital is arguing that *Acosta* abrogated *Downey*, we disagree. The *Acosta* Court relied on *Downey* in its explanation of the requirements for expert testimony. *Acosta*, 2016-NMSC-012, ¶ 24 (relying on *Downey* for the proposition that "[a] court must determine whether the proffered expert testimony is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." (internal quotation marks and citation omitted)). Nothing about the holding in *Acosta* changes this basic requirement. We conclude that the holding in *Downey*, on which the district court properly relied, is applicable here.

{58} In sum, the district court did not err in excluding Dr. Pike's testimony related to Xanax and marijuana.

**CONCLUSION**

{59} For the foregoing reasons, we affirm.

{60} **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**RODERICK T. KENNEDY, Judge**


_____

**LINDA M. VANZI, Judge**